UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:24-cr-00060-M

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | <u>Sentencing Memorandum</u> |
| | ) | |
| GEORGE TAYLOR JR., | ) | |
|     Defendant. | ) | |
| | ) | |

The defendant, George Taylor Jr., took out of his employees' paychecks federal income taxes that he did not pay over to the IRS, but rather kept for himself and his business. When his employees notified him that the taxes were due, he told them he would "take care" of it and falsified his company's books to make it look as though the taxes had been paid. He engaged in this criminal scheme for years and caused a tax harm to the United States of $2,272,072. These deliberate, repeated offenses reflect the careful calculations of a criminal who believes the law does not apply to him. Taking into account his history, in order to reflect the seriousness of the offense, and to deter this defendant and other tax cheats from similar conduct, the Government requests a within-Guidelines sentence of 27 months imprisonment.

**Procedural Background**

On August 21, 2024, Taylor pleaded guilty to a one-count information charging him with willful failure to account for or pay over a tax in violation of 26 U.S.C. § 7202, pursuant to a plea agreement. Dkt. 1, Information; Dkt. 11, Minute Entry;

Dkt. 13, Plea Agreement. Sentencing is set for the November 19, 2024, term on November 21, 2024, before Chief Judge Richard Myers II. Dkt. 11.

On October 15, 2024, U.S. Probation issued an initial Presentence Investigation Report ("PSR") which calculated a total offense level of 17 based on a tax loss of $2,272,072 and adjustments for Taylor's timely acceptance of responsibility and zero-point offender history—consistent with the Plea Agreement. Dkt. 16, Initial PSR. The parties clarified the offense conduct via email but did not make substantive objections to the PSR. Dkts. 17, 18.

**Factual Background**

Taylor owned and operated National Speed, a high-performance automotive services business, under different, related names out of Wilmington, North Carolina, since 2007. PSR ¶ 6. From 2014 through 2021, he willfully failed to pay National Speed's employment taxes—unlawfully depriving the IRS of $2,272,072. PSR ¶ 8. Of that tax loss, over $1,500,000 were "Trust Fund Taxes"[1]—taxes that Taylor withheld from his employees' paychecks on their behalf that the law required he pay to the IRS. Instead, he kept those tax funds for himself and his business.

---

[1] Employers like Taylor are required to withhold taxes from their employees' paychecks and make payments to the Department of Treasury through the IRS. These taxes include federal income tax withholding, Social Security, and Medicare taxes. These taxes are often referred to as "Trust Fund Taxes" because employers are required to hold the withheld amounts in trust until paid over to the United States. In addition to Trust Fund Taxes, employers are also required to "match" their employees' Social Security and Medicare taxes. Together, the employees' portion (*i.e.*, Trust Fund Taxes) and the employers' portion (the matching Social Security and Medicare taxes) are collectively referred to as "employment taxes." Additionally, the Social Security and Medicare taxes—(*i.e.*, employment taxes not including income tax withholdings)—are referred to as Federal Insurance Contributions Act ("FICA") taxes.

2

From 2014 to 2021, Taylor employed between 10 and 47 employees a year at National Speed. Taylor paid those employees and withheld trust fund taxes from their paychecks. PSR ¶ 6. Using multiple employer identification numbers ("EINs") for National Speed, Taylor also caused the issuance of IRS Forms W-2, Wage and Tax Statements ("Forms W-2"), that reported to the employees their withholdings (*ie.* the Trust Fund Taxes withheld from their paychecks), as seen in the example below:



The employees relied on the information reported on their Forms W-2 to file their income tax returns, including to claim their tax withholdings. The employees also filed the Forms W-2 with the IRS as attachments to their annual IRS Forms 1040, U.S. Individual Income Tax Returns ("Forms 1040"). According to those Forms W-2, Taylor employed the following individuals at National Speed, withheld the following Trust Fund Taxes, and incurred the following tax liabilities:

| Tax Year | # of W-2s | W-2 Amounts | Trust Fund Taxes Due | Employer's Portion Due | Total Amount Due |
|---|---|---|---|---|---|
| 2014 | 10 | 403,002.00 | 76,879.65 | 30,829.65 | 107,709.31 |
| 2015 | 12 | 447,839.00 | 86,247.68 | 34,259.68 | 120,507.37 |
| 2016 | 11 | 533,321.00 | 104,979.06 | 40,799.06 | 145,778.11 |
| 2017 | 10 | 542,014.00 | 110,000.07 | 41,464.07 | 151,464.14 |
| 2018 | 24 | 1,052,168.00 | 189,843.85 | 80,490.85 | 270,334.70 |
| 2019 | 33 | 1,535,267.00 | 280,093.95 | 117,420.95 | 397,514.90 |
| 2020 | 40 | 1,950,947.00 | 350,871.45 | 147,864.45 | 498,735.89 |
| 2021 | 47 | 2,316,771.00 | 405,038.79 | 174,988.79 | 580,027.59 |
| **Totals** | **187** | **8,781,329.00** | **1,603,954.51** | **668,117.51** | **2,272,072.01** |

PSR ¶ 8.

Taylor caused National Speed to not pay any of the above amounts to the IRS. Moreover, Taylor did not file any Employer's Quarterly Federal Income Tax Returns, "Forms 941." Forms 941 are required to be filed by the employer every quarter, with the accompanying payment due. The purpose of the Form 941 is for the employer to inform the IRS of the employment taxes that it owed and to document the tax payments it made (or failed to make). PSR ¶ 7.

Taylor was the owner of National Speed. PSR ¶ 6. At times, Taylor appointed others to serve as officers, including Chief Executive Officer ("CEO"), but, at all times, Taylor was the boss. His employees understood that National Speed was his business, he was the boss, and he controlled all the financial decisions for his business. In 2016, at Taylor's direction, one of Taylor's employees opened Bank of America accounts for the business and listed himself (not Taylor) as the sole

4

authorized user for the accounts. Taylor nevertheless had access to those accounts and controlled the business's finances.

Taylor was aware of and responsible for National Speed's failure to pay these taxes to the IRS, including over $1,500,000 that National Speed withheld from its employees' paychecks in the name of federal taxes; he simply chose to keep the money for himself and for his business rather than pay the IRS. He employed multiple bookkeepers and assistants as employees of National Speed, and they informed him when tax filings and tax payments were due. He told them he would take care of it. PSR ¶ 7.

Moreover, National Speed used accounting software to calculate the taxes to be withheld from the employees' paychecks and to calculate the annual Forms W-2 that National Speed issued to its employees. That same software could file the corresponding Forms 941 and pay the corresponding taxes to the IRS. However, Taylor directed his employees to use the program only to calculate the taxes, not to make tax payments or filings to the IRS. Once the employees made these calculations and his employees provided these numbers to him, Taylor personally directed the payment to his employees for their net income—*i.e.*, their salary less their tax withholdings. Taylor made the payroll calculations, deducted the taxes due from his employees' paychecks, and issued them a paycheck with the taxes withheld. However, he then never paid those taxes withheld from his employee paychecks to the IRS. He simply decided not to make the required payments and not to make the required filings to the IRS. To complete the scheme, Taylor logged on to his company's

accounting software and falsified the data. He manually entered data that reflected tax payments, when in fact no payments were made to the IRS. PSR ¶ 7. Through his scheme, Taylor kept the withholdings that he owed to the IRS for himself and concealed his theft in the company books and records.

For example, on January 30, 2020, he input a false entry reporting that National Speed made a $19,335.66 payment to the IRS on October 7, 2019.

| Date | Transaction Type | Name | Memo/Description | Amount |
|---|---|---|---|---|
| Beginning Balance | | | | |
| 10/07/2019 | Tax Payment | IRS | Tax Payment for Period: 09/28/2019-09/30/2019 | -19,335.66 |

| Last Modified | Last Modified By | Create Date | Created By |
|---|---|---|---|
| 01/30/2020 03:32:30 AM | George Taylor | 01/30/2020 03:32:18 AM | George Taylor |

On March 31, 2020, he input another false entry reporting that National Speed made a $21,870.95 payment to the IRS on February 11, 2020, as seen below:

| Date | Transaction Type | Name | Memo/Description | Amount |
|---|---|---|---|---|
| 02/01/2020 | Tax Payment | NC Department of Revenue | Tax Payment for Period: 10/01/2019-12/31/2019 | -14,393.00 |
| 02/03/2020 | Tax Payment | NC Employment Security Commission | Tax Payment for Period: 10/01/2019-12/31/2019 | -1,151.85 |
| 02/11/2020 | Tax Payment | IRS | Tax Payment for Period: 01/29/2020-01/31/2020 | -21,870.95 |

| Last Modified | Last Modified By | Create Date | Created By |
|---|---|---|---|
| 03/31/2020 09:47:44 AM | George Taylor | 03/31/2020 09:47:27 AM | George Taylor |
| 03/31/2020 09:48:05 AM | George Taylor | 03/31/2020 09:47:52 AM | George Taylor |
| 03/31/2020 09:51:40 AM | George Taylor | 03/31/2020 09:51:30 AM | George Taylor |

Again, for clarity, Taylor made sure that National Speed made no such payments and filed no Forms 941.

Without a doubt, Taylor knew how to properly prepare and file IRS Forms 941 for National Speed when it was to his benefit. In 2020, he applied for and received a Paycheck Protection Program ("PPP") loan for National Speed.[2] As part of that

---

[2] By referencing this PPP application, the Government is not implying that Taylor committed fraud in that application. Rather, the application itself is evidence that

6

application process, he attached Forms 941 for National Speed for the second quarter of 2019 through the first quarter of 2020. Those forms purported that National Speed was making timely tax deposits of approximately $100,000 a quarter, when in fact National Speed was not making *any* deposits or paying *any* of their employment taxes. PSR ¶ 9.

Rather than pay the taxes to the IRS, Taylor used the more than $2 million in funds to grow his business, including paying the employees their net income, paying more than $200,000 for employee meals, and paying approximately $64,000 toward an additional business location.[3] PSR ¶ 7.

## Sentencing Guidelines

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the [United States Sentencing] Guidelines should be the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Government agrees with the Guidelines calculation in the PSR.

Taylor faces a base offense level of 22 because the tax loss he caused is $2,272,072. PSR ¶ 38; *see also* Plea Agreement ¶ 5.b. He should receive a two-point

---

Taylor knew how to properly prepare Forms 941 accounting for the taxes he withheld from its employees and reporting National Speed's tax obligations to the IRS, he simply chose not to.

[3] These figures are taken from National Speed's general ledger, which contains documented inaccuracies. Specifically, the ledger states that National Speed was making employment tax payments when the business was not. However, the expansion of the business from a single Wilmington location to a second location in Richmond and plans to expand to a third location in Norfolk are corroborated from employee statements.

reduction as a zero-point offender, PSR ¶ 44, and an additional three-point reduction for his timely acceptance of responsibility, PSR ¶¶ 45–46. With a total offense level of 17 and a criminal history category of I, he faces a Guidelines range of 24 to 30 months. PSR ¶ 49.

Probation did not identify any factors that warrant a departure or variance. PSR ¶ 63. The Guidelines range that Taylor faces is the result of "empirical analysis" and reflect the relevant "legislative history supporting higher sentences for white-collar crime." *United States v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010). The Court should not vary from this Guidelines range absent a compelling justification of equal degree. *See United States v. Howard*, 28 F.4th 180, 205 (11th Cir. 2022) ("And though the sentencing guidelines are only advisory, a major variance from the guidelines range 'should be supported by a more significant justification . . . .'" (citing *Gall*, 552 U.S. at 50)).

## 18 U.S.C. § 3553(a) Factors

Taylor's criminal actions were repeated and deliberate. He was motivated by greed, and he continued to flaunt the law despite his employees and his accounting software reminding him of his legal obligations. Section 3553(a) instructs the Court to impose a sentence that is sufficient, but not greater than necessary, to satisfy the goals of sentencing. A sentence of 27 months—the middle of the defendant's applicable Guidelines range—is indeed necessary to achieve the purposes of sentencing: reflecting the seriousness of attempting to defraud the treasury of over $2,000,000; addressing the defendant's commitment to criminal employment tax

8

fraud tactics; and deterring others from similarly pocketing their employees' taxes and flaunting the nation's tax laws in order to expand their business and personally enrich themselves.

*A. Nature and Circumstances of the Offense*

Taylor's repeated and deliberate tax offenses merit at least 27 months of imprisonment. He caused a tax loss of $2,272,072. That figure alone demands a significant sentence of imprisonment. But the dollar figure alone does not tell the full story of Taylor's criminal conduct. He committed his crimes by taking taxes from his employees' paychecks and spending it however he saw fit. These were not split-second decisions or poor choices made under emotional duress. Rather, Taylor had the time to consider his options every single time he calculated and wrote payroll checks, and, every single time, he chose to commit his crimes. Moreover, the conduct spanned years. Even with the benefit of perspective of those years, during which his employees and his accounting software reminded him of his tax obligations, he chose to continue his criminal conduct; continuing to take his employees' taxes and spend it for himself.

Taylor—a self-professed serial entrepreneur—may argue that he has invested more money into National Speed than he earned. That may well be so, but it has nothing to do with this crime. Americans can spend *their* money as they see fit, including on business ventures. However, they cannot steal *other people's* money— in this case their employees' payroll taxes—to prop up their otherwise failing business ventures. *See Davis v. United States*, 961 F.2d 867 (9th Cir. 1992) (affirming

9

conviction in which "The federal government is in effect subsidizing the corporation's recovery by foregoing collectible tax dollars."); *Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir. 1987) (per curiam) ("The government cannot be made an unwilling partner in a business experiencing financial difficulties."); *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir. 1979) ("The United States may not be made an unwilling joint venturer in the corporate enterprise.").

Taylor—like most tax cheats—was motivated by greed. While Taylor was defying the nation's tax laws, he was expanding his business, hiring more employees, increasing overhead and adding more business locations. His sizeable financial transfers into National Speed indicate that he had access to significant wealth to grow his business, increasing National Speed's value should he later chose to sell it. As evidenced by the sums of funds he had available, he stole the payroll tax not out of desperation but out of greed—a desire to grow the business as fast as possible— undeterred by the possibility of any legal sanction.

Indeed, his crimes were marked by deceit, allowing him to continue his crimes for nearly a decade and pocket more than $2,000,000. From 2014 through 2021, he didn't file any Forms 941, which are required to report to the IRS the mounting employment taxes due. He further obfuscated his conduct by changing National Speed's EIN, despite operating the same business and employing the same employees. In doing so, he delayed the time with which the IRS could identify his crimes based on the tax returns his employees were filing because different EINs were reported by Taylor on employee Forms W-2. Fully aware of the crime he was

committing, he worked to conceal it from his bookkeepers and to make the crime difficult to detect. He falsified his own accounting records in order to stop any internal checks—whether his employees or his accounting software—from identifying just how serious his violations of the tax laws were.

A middle of the Guidelines sentence is therefore necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

*B. History and Characteristics of the Defendant*

Taylor accepted responsibility, agreed to pay restitution, and has no convictions that trigger criminal history points. This background is appropriately reflected in his Sentencing Guidelines calculations by effectively reducing his offense level by five points. The facts do not merit a lower sentence within the Guidelines range, and any further reduction would skew the balancing the Court must conduct in issuing a sentence that promotes justice as directed by 18 U.S.C. § 3553.

Putting his criminal history into context, this is not a case where the defendant's conduct was aberrant or representative of a brief and insolated lapse in judgment. Instead, this "zero-point offender" has been a criminal for nearly a decade and built his business on the back of his employees' taxes. Similarly, Taylor has agreed to plead guilty and pay restitution for his tax crimes, and that acceptance of responsibility is already appropriately accounted for in the Guidelines calculation. Criminals should pay back the money they've taken after they get caught. Taylor's restitution payment and plea of guilty is indeed the first step towards rehabilitation,

11

but it is not extraordinary in any way and does not merit a departure from the Guidelines calculation. *See United States v. Bolden*, 889 F.2d 1336, 1340–41 (4th Cir. 1989) (borrowed money from family and friends to pay restitution may be relevant in permitting reduction within Guidelines but does not justify departure); *United States v. Oregon*, 48 F.4th 298, 304 (7th Cir. 2023) (The "'voluntary payment of restitution prior to adjudication of guilt' is relevant to whether the defendant receives credit for accepting responsibility, which Oregon received—but paying restitution does not require a lower sentence.") (citing U.S.S.G. § 3E1.1 cmt. n.1(c)); *United States v. Welch*, No. 04-4080, 2005 U.S. App. LEXIS 195277, *2 (2d Cir. Sept. 7, 2005) ("Because the defendant's payment of restitution was within the 'heartland' of cases contemplated by section 3E1.1, a departure under section 5K2.0 on that ground was not warranted.").

Neither does the defendant's personal background. During the conduct at issue, Taylor enjoyed a comfortable salary as the CEO of two different for-profit companies, National Speed and Tru Colors. PSR ¶¶ 32–33. Moreover, as evidenced from his accounting history, he had access to millions of dollars in funds from his prior business ventures. With that salary and those funds, he had more advantages than most defendants who appear before this Court, and that should be considered by the Court as part of his history and characteristics in determining the appropriate sentence. Taylor enjoyed a life of financial comforts, filled with benefits that many Americans can never realistically expect to receive. But that was not enough for him. He chose a different path lined with greed and deception. Moreover, even after

12

depriving the treasury of his employees' taxes for years, he helped himself to a PPP loan in 2020.

Considering Taylor's financial standing when he committed this crime and the length of time during which he continued to flaunt the law, he should be sentenced squarely within the middle of the Guidelines range to a sentence of 27 months.

*C. The Need to Promote Respect for the Law and Afford Adequate Deterrence*

"[T]axes are the lifeblood of government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1935). Criminal tax prosecutions serve not only to punish the violators, but also to promote general deterrence and encourage all taxpayers to abide by the rules and pay their fair share of taxes. Recent data indicates a tax compliance rate by the general population of approximately 85%.[4] This means that, while many individuals comply with the law, many others—like the defendant—shirk their taxpaying obligations. This comes at a real cost. The "gross tax gap" is estimated to be $696 billion annually.[5] This is money that cannot be spent on education, health care, the military, or the government's myriad other obligations. Fitting the defendant's disregard for his tax obligations into this larger context demonstrates the seriousness of his offenses and the particular need to promote respect for the law.

---

[4] Internal Revenue Service, Research Applied Analytics & Statistics, *Tax Gap Projections for Tax Year 2022*, IRS Publication 5869 (Oct. 2024), https://www.irs.gov/pub/irs-pdf/p5869.pdf, at 4.
[5] The gross tax gap is defined as the amount of taxes owed that are not voluntarily and timely paid. *Id.*

13

Part of promoting respect for the law is also maintaining confidence in the justice system. This confidence is particularly undermined in a tax context by the belief that wealthy individuals can pay their way out of prison by simply paying the back taxes that they had evaded or, of equal concern, that less wealthy individuals believe that the wealthy can pay their way out of prison. This perception—even if erroneous—is injurious to the system as a whole. As the Fifth Circuit has noted: "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards—one for the powerful, the popular, and the well-connected, and another for everyone else." *United States v. Taffaro*, 919 F. 3d 947, 949 (5th Cir. 2019). To maintain confidence in the justice system, it must be the case that nobody can pay his or her way out of jail, and that the public understands that this is in fact the case. This is all the more true in the case of a successful businessman, such as Taylor, who engaged in cheating and deceiving the IRS over a period of years, and who has the necessary resources to be able to satisfy any financial penalties imposed by the Court. A Guidelines sentence is a significant sentence for a first-time offender, and it clearly reflects the harm that the IRS and society at-large have suffered as a result of Taylor's calculated scheme. It is the appropriate sentence in this case.

The Sentencing Guidelines clearly articulate that deterrence should be the primary consideration when sentencing defendants for tax crimes. The reasoning is compelling. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from disobeying the tax

laws is of the utmost importance when punishing criminal tax violations. *See* U.S.S.G. § 2T1, introductory cmt. (explaining that, in light of "the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines," and that "[r]ecognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."); *see also Snipes*, 611 F.3d at 872 ("Although the [district court's] discussion about general deterrence was somewhat longer than the discussion of the other factors, its length corresponds with the emphasis the Sentencing Guidelines placed on deterrence in the criminal tax context."). A term of imprisonment is often necessary in order to achieve such a deterrent effect, given the limited number of tax prosecutions relative to their incidence.[6] The Fourth Circuit has recognized and endorsed this principle in vacating a probationary sentence imposed in a tax evasion case:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). And indeed, "[s]tudies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and

---

[6] *See generally* Louis Kaplow and Steven Shavell, Fairness Versus Welfare, 114 Harv. L. Rev. 961, 1225-1303 (2001).

positive deterrent effect."  Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011).

Deterrence is particularly crucial in a case such as this where the defendant—an employer—controls the ability to withhold taxes from his employees and pay them over to the IRS.  Employment taxes can be a tempting source of extra funds for any business officer, whether to provide relief to the company or to line that officer's own pocketbook.  When such officers make the decision to commit tax fraud, they tilt the playing field in their favor, thereby harming the many diligent businesses who faithfully comply with their tax obligations—succeeding or failing on their merits, rather than by cheating the system.  As seen here, employees have no practical method to police their employers, so the threat of criminal consequences provides the only incentive for employers to pay over the taxes as required.  It is therefore critical for this sentence to show that there are real and significant consequences to giving into this temptation.

Moreover, "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  It is this type of mentality that is most amenable to deterrence.  *See generally United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("[D]eterrence is an important factor in white-collar cases, where the motivation is greed. . . . [W]e have set aside sentences of little or no imprisonment because they do not constitute just punishment

16

for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others.").

Absent such deterrence, other successful Americans with the means and opportunity to enrich themselves at the cost of other taxpayers will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished for committing tax fraud. *See Engle*, 592 F.3d at 502; *see also United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a prison sentence is not imposed."). The Government recommends a within-Guidelines sentence of 27 months in order to properly disincentivize would-be-tax-cheats. Again, for perspective, that is approximately 1 year for every $1,000,000 of attempted tax fraud. Anything less would send an inappropriate message to those weighing the consequences of tax fraud that the illicit benefits outweigh the risk of imprisonment.[7]

The sentence should also assure law-abiding taxpayers that they are not credulous rubes for filing tax returns and paying their share of taxes. In short, our nation's tax system depends on the voluntary compliance of honest taxpayers. Here, a significant sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for taking taxes from your employees and keeping them for yourself.

---

[7] The 2022 real median household income was $74,580. Gloria Guzman and Melissa Kollar, Income in the United States: 2022, U.S. Census Bureau (Sep. 2023), https://www.census.gov/content/dam/Census/library/publications/2023/demo/p60-279.pdf, at 1. Considering most Americans earn less than $100,000 a year, many Americans may look at a prison sentence of approximately $1,000,000 a year as "worth it."

## Restitution

Taylor has agreed to pay restitution to the IRS of $2,272,072, plus interest. Plea Agreement ¶ 2.b. Pursuant to 18 U.S.C. § 3663(a)(3), the Court should order Taylor to pay the restitution as agreed to by the parties.[8]

## Conclusion

For years, the defendant undermined the U.S. tax system and kept for himself over $2,000,000 in employment taxes that he withheld from the paychecks of his employee. These serious crimes deserve serious punishment. For the aforementioned reasons, the Government respectfully recommends that this Court sentence the defendant to a within-Guidelines sentence of 27 months, a three-year term of supervised release, a mandatory special assessment of $100, and restitution payable to the IRS in the amount $2,272,072, plus interest. Such a sentence is appropriate in this case and consistent with the U.S. Sentencing Guidelines and the factors enumerated in 18 U.S.C. § 3553(a).

This 8th day of November 2024.

MICHAEL F. EASLEY, JR.
United States Attorney

/s/ Brian Flanagan
BRIAN E. FLANAGAN
Trial Attorney
U.S. Department of Justice, Tax Division

ETHAN A. ONTJES
Assistant United States Attorney
Criminal Division

---

[8] Taylor has already submitted a restitution check to the IRS. The Government nevertheless requests the Court *order* restitution so that the IRS may use the Court's order to assign the restitution payment to the respective tax periods.

## CERTIFICATE OF SERVICE

  I hereby certify that on November 8, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all counsel of record.

              /s/ Brian Flanagan
              Brian Flanagan
              Trial Attorney
              U.S. Department of Justice, Tax Division